### TEXAS & G. RY. CO. v. BOREN.†
(Court of Civil Appeals of Texas. Texarkana. May 16, 1912. Rehearing Denied June 27, 1912.)

1. CARRIERS (§ 318*)—CARRIAGE OF PASSEN-GERS—INJURIES—SUFFICIENCY OF EVIDENCE.

In a passenger's action for injuries in a wreck caused by a misplaced switch, evidence *held* to show that the switch was unlocked and left so by a railroad employé who had been intrusted with a switch key.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

2. CARRIERS (§ 283*) — INJURIES TO THIRD PERSONS—SCOPE OF EMPLOYMENT.

Where a railroad employé intrusted with a switch key leaves the switch lock insecurely fastened, his act is one within the ordinary scope of his employment, and the railroad company is liable for resulting damages.

[Ed. Note.—For other cases, see Carriers. Cent. Dig. §§ 1119–1124, 1140, 1141; Dec. Dig. § 283.*]

Appeal from District Court, Panola County; W. C. Buford, Judge.

Action by Austin Boren against the Texas & Gulf Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Appellee was a passenger on appellant's passenger train en route from Gary to Carthage, Tex. This train, running north, reached the south end of appellant's switch at Murvaul about 8 o'clock p. m. When the train reached the switch, the tender, engine, and front trucks of the mail car became derailed. The derailment was due to the switch being unlocked and partially turned and out of proper alignment either for the main track or the siding. The appellee at the moment had gotten out of his seat to get a drink of water, and was standing in the aisle. The train stopped suddenly and with considerable shock by reason of the derailment, and the appellee was caused to fall obliquely forward in such manner that his pelvis bone struck upon the end of the arm of the seat and glanced off, and the arm of the seat gouged his abdomen with force and severity. The fall against the end of the arm of the seat produced a complete inguinal hernia, a partial ventral hernia, and an injury in the region of the pelvis which so inflamed and shortened the psoas muscle that the femur necessarily extends forward, and cannot be placed perpendicularly under the body nor made to extend backward. There is evidence that his injuries produced great suffering, and are real and permanent. There is evidence on the part of appellant that, instead of a partial ventral hernia, the appellee had suffered only a weakening of the abdominal wall. The appellant also sought to show that the injuries could be relieved or lessened by surgical operations, but the evidence shows that the result of such operations would be problematical, dangerous, and expensive. All issues of fact were decided by the jury in favor of appellee, and, as the evidence warrants their findings, they are sustained.

The appellee specifically alleged several acts of negligence, but the court submitted to the jury only the issue of whether the defendant or its servant acting within the ordinary scope of his authority negligently caused or permitted the switch at the place of the derailment to be out of reasonably safe alignment and condition for the passage of the train, thereby causing appellee to be injured. The appellant answered by general denial, plea of contributory negligence, and that the derailment resulted from interference by some one not in its employ, and that the appellee is now suffering from injuries received prior to the wreck, and not from any injuries received in the wreck.

Young & Stinchcomb, of Longview, Brooke & Woolworth, of Carthage, and Terry, Cavin & Mills, of Galveston, for appellant. Johnson & Edwards, of Tyler, for appellee.

LEVY, J. (after stating the facts as above). The court submitted to the jury the issue of negligence of whether the defendant or its servant acting within the ordinary scope of his employment negligently caused or permitted the switch and its appliances at the place of derailment to be out of reasonably safe alignment and condition at the place of injury.

[1] By the first assignment the contention is made that there was no evidence tending to show that the switch was unlocked or left unlocked by any employé of the appellant acting within the scope of his employment, and hence that it was error to submit such question to the jury. The objection as made limits and confines this court to the consideration only of whether there was any evidence authorizing the jury to find that any employé of the appellant acting within the ordinary scope of his authority unlocked or left unlocked the switch at the point of injury. It is admitted in the record that the derailment was due to the points of the switch being at the time opened up and out of sufficient alignment either for the main track or the siding, thus causing the wheels of the engine to pass in the open space between the switch points and the main rails. Immediately after the derailment, the employés on the train examined the switch and the switch stand to locate the cause of the switch being opened and of the derailment, and the testimony of such employés agree in respect to the condition at the time of the switch and switch stand. According to their

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes
† Writ of error denied by Supreme Court.

evidence, the lever by which the switch was operated was out of the slot between one and two inches, and slanting slightly from a perpendicular position, and the switch lock was hanging down by its chain attachment, and the lock was unlocked and hanging open. All the testimony agrees that the lever could not be pulled out of the slot at all when the switch stand was locked, and, when the lever was in the slot and locked, the switch would be properly adjusted and aligned to the rails for safe passage of the cars. The testimony further agrees that the switch could not be deranged, if locked, by a heavy train passing over it or coming against the switch, and that the lock could not be opened except by means of a switch key made and furnished specially for such locks, or by a lick from a club. As this condition of the switch and the switch stand was existing immediately after the wreck, the jury would be authorized to conclude therefrom that it was in that condition at the time and before the engine reached that point, and caused the derailment. As it was shown that the switch could not be deranged, if locked, by a heavy train passing over it or coming against it, and that the lock was a strong one of approved pattern, having a key specially made and furnished for the purpose of opening it, and that the switch stand was kept locked by the company when not in actual use by employés, the jury would be authorized to infer from these circumstances, in connection with the further fact that the switch was open and the lock was unlocked and hanging down at the time of the derailment, that it was left in that condition at some time previously in its use by the employés of appellant. Speaking, therefore, to the point made by the assignment, that there is no evidence that any employé unlocked or left unlocked the lock, it must depend upon the further circumstances and inferences allowable therefrom. The appellant proved by all its several passenger and freight crews, which were all the trains that had gone over the road, that none of the trains or crews passing the point of derailment had used the switch at the south end of the side track on either June 2d, 3d, or 4th. The derailment occurred at 8 o'clock p. m. of the 4th of June. A train crew, it was shown, had put 12 cars on the siding on June 2d from the north end, and on June 3d a train crew took two of the cars out of the siding, but the crews each testified that they only used the north end of the siding, and not the south end. The conductor and engineer of the train passing the place of derailment on the morning of the 4th, which was the last train before the train that was derailed, each testified that at 11 o'clock when they passed on the train they specially observed the switch stand in question, and it was lined up at the time and the lever was standing perpendicular, as it should be, and the lock was locked. The

section foreman with a companion, who was not an employé, went by the siding on the morning, and also at 6 o'clock of the evening of the derailment, and they each specially observed, they said, the switch, and found it snug against the rails and in proper alignment. The section foreman testified, though, that "I don't remember looking at the switch stand Sunday morning, as those points were perfect I had no occasion to look at anything else, and I don't know whether the switch stand was locked or not." But considering the physical fact that the lock was unlocked and hanging open, and the switch open, the issue of who unlocked it could not be said to be concluded as a matter of law by the evidence of the crews testifying to the effect that they did not use the south end of the switch, and that it was not unlocked by them or up to 11 o'clock of the day of the injury. The right of the jury to fairly draw inferences from all the circumstances must be further considered. There is no pretense in the evidence that any person other than employés were about the switch at any time except the one person with the section foreman, and there is no pretense that such person in any way handled or was about the lock. There is no pretense in the record that persons or boys were around or handled or interfered with the switch. It was a very small station. There was proof that the company never had any trouble by interference of unauthorized persons with its switch stands up to the time of the derailment. It was shown that the lock provided for the stand was of approved pattern and adequate for the purpose, and was fitted only by a key of the particular kind used by the company. The company always required the switch stand to be kept locked unless in actual and present use. Only employés, it was shown, such as brakemen, conductors, and section foremen, and sometimes engineers, have keys to the switch locks, furnished them by the company. It was testified by the conductor that, when the lever is out of the slot, it is because the switch stand is not locked at the time, and that, if a switch lock is ever opened, it must be done by means of the key or by hitting or breaking it with a club. It was testified by the conductor that upon his examination of the lock just after the derailment he did not discover anything improper or wrong with the condition of the lock that would make it improper for the company to use the lock. The section foreman examined the lock the next morning and made a test of it, as did he and several others afterwards, and such testimony shows that they tested the lock by forcibly jerking it to see if it would open, and that it could not be jerked open. The company, it appears, still uses the lock, and it is in good condition. As the lock was shown to be of specially approved pattern, and at the time of derailment in good condition, and by examination and tests shown

to be in good workable condition and undamaged in its parts and of such strong mechanism as would not yield to heavy jerks, it was in the province of the jury to reasonably and fairly conclude from such facts that any inference that a blow or lick was struck by any one on the lock to cause it to open was negatived. And as there was no evidence or circumstance showing or tending to show that any employé had lost or mislaid his key to the lock, and there being evidence to show that the company had never had trouble from interference with its switch stands by unauthorized persons, or that unauthorized persons were about or usually about the switch, the inference was fairly permissible that no unauthorized person interfered with the switch. The facts fairly authorizing, as they did, the inference that the switch lock was unlocked by a key and not by a blow or lick, then the proof showing, as it did, that the lock was constructed for a specially fitting key only to unlock it, the jury were warranted, as in their province, to conclude that the key that unlocked the switch was a key provided for the purpose, which, according to the evidence, was the key furnished by the company to its employés. The evidence warranting the jury to conclude that a switch key furnished by the company to its employés unlocked the switch stand, and the evidence showing that only employés were intrusted with such keys, and that this switch was used by employés recently, the jury were warranted from these facts, in the light of the other facts, to infer that some employé unlocked or left insecurely locked the lock.

[2] If some employé left the lock insecurely locked, as the jury might have found notwithstanding their denial, then the act would be in the case an act within the ordinary scope of his employment, for it is shown that those employés having keys are intrusted with them by the company with authority to operate the switch lock. Such inferences being fairly warranted by all the facts and circumstances in the record, it could not be said, we think, that there was no evidence to carry the issue to the jury. The assignment is overruled.

By the eleventh, twelfth, thirteenth, and fourteenth assignments it is contended that the verdict is excessive. After much consideration of the evidence, we have reached the conclusion that this court would not be warranted in setting aside the deliberate judgment of the jury, which was approved by a conscientious trial judge, in respect to the extent and effect of the injuries suffered and the amount of the compensation therefor.

We have considered all the other assignments, and are of the opinion that they should be overruled.

The judgment is affirmed.